IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal Action |
| | : | |
| v. | : | No. 2:94-CR-00007-RWS-JCF-1 |
| | : | |
| TERRY JEROME COLLEY | : | |

**REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION
TO MR. COLLEY'S MOTION FOR COMPASSIONATE RELEASE**

The Government opposes Mr. Colley's request for compassionate release under 18 U.S.C. § 3582(c)(1)(A)—despite that it agrees a sentence reduction is appropriate. The Government "supports commuting Mr. Colley's [custodial] sentence to 36 years" but urges the Court to deny Mr. Colley's motion and allow his sentence to be reduced through the clemency process. (Doc. 215 at 12, n.3).

The Government offers no explanation why it would be preferable for Mr. Colley's sentence to be reduced through clemency proceedings. At best, such a procedure would be a waste of time and governmental resources, as the parties have fully briefed the matter here, and the Court has the authority to reduce Mr. Colley's sentence. At worst, leaving it for another entity to reduce Mr. Colley's disproportionate sentence creates unnecessary risk. There is just no guarantee that, if the Court were to pass on the opportunity to correct a sentence the parties agree is unjust in length, Mr. Colley's sentence will ever been reduced. Indeed, in the ten months since the Government expressed support for reducing Mr. Colley's

sentence, Mr. Colley's sentence has not been commuted. He continues to live under a sentence that the Government agrees should be substantially reduced.

While the parties agree that Mr. Colley's sentence should be reduced, the parties do not agree on the extent of such a reduction. The Government supports a reduction from sixty to thirty-six years, a position the Government voiced in December 2019, before the coronavirus pandemic. (Doc. 185 at 2, n.1). Mr. Colley argues that his heightened risk during the pandemic warrants a greater reduction, to time served. This difference amounts to about twelve years, but it could amount to Mr. Colley's life. The danger he faces during this pandemic cannot be overstated. Mr. Colley, at fifty years old, has the underlying medical condition that is "the number one risk factor for developing a severe case of COVID-19 in people under the age of 55": obesity.[1]

Taking into account Mr. Colley's good time credit, time served would be the rough equivalent of twenty-three months concurrent on the attempted and armed bank robbery counts (1, 2, 4, 6) and eighty-four months consecutive on each of the § 924(c) counts (3, 5, 7).[2]

---

[1]    *Obesity & COVID-19*, HOUSTON METHODIST, https://www.houston methodist.org/blog/articles/2020/jun/obesity-and-covid-19-can-your-weight-alone-put-you-at-higher-risk/ (last visited Sept. 7, 2020).

[2]    Mr. Colley's federal sentence began to run on February 22, 2001. (Doc. 181 at 7). According to BOP's computation data, as of April 20, 2020, he had obtained 1203 days of good time credit. (Doc. 210-2 at 1).

Alternatively, the Court could reduce Mr. Colley's sentence to 360 months (or thirty years)—108 months on the attempted and armed bank robbery counts concurrent and eighty-four months consecutive on each of the 924(c) counts. With his good time credit, Mr. Colley estimates that he will be eligible for release to a halfway house this month.

Either sentence would be appropriate under 18 U.S.C. § 3582 and 18 U.S.C. § 3553, would help mitigate the heightened risk Mr. Colley's medical conditions pose during the coronavirus pandemic, would be consistent with his remarkable rehabilitation, and, in light of the modern § 924(c), would reflect the seriousness of the offenses, promote respect for the law, and provide just punishment.

## I.    The coronavirus presents a risk to Mr. Colley, as it continues its spread through the Bureau of Prisons.

The Government asks the Court to consider that the Department of Justice and the Bureau of Prisons have "taken many steps to protect the health and safety of federal inmates during this pandemic." (Doc. 215 at 3). Mr. Colley does not dispute that some safety measures have been implemented, but those measures have not been able to stop the spread of the coronavirus. In the seven weeks since Mr. Colley filed his Amended Motion for Compassionate Release (Doc. 210), the disease has continued to infect, sicken, and kill federal inmates. In this seven-week period, an *additional* 21 inmates and 1 staff member have died from COVID-19 and

an *additional* 5425 inmates and 370 inmates are in recovery from COVID-19. Currently, 1823 inmates and 643 staff members have confirmed, active cases; there are confirmed, active cases in 112 BOP facilities and 38 residential reentry centers.[3]

There are also exceptions to the protective measures the Government cites. For example, while the movement of inmates at USP Florence, where Mr. Colley is incarcerated, continues to be restricted, the non-residential drug treatment program at the institution has resumed. These meetings include upwards of thirty-five inmates in the same room; there are no temperature checks or COVD-19 testing, and there is no social distancing. For inmates enrolled in the treatment program, like Mr. Colley, attendance at the meetings is mandatory.[4] No exceptions are permitted for inmates at heightened risk of severe effects from COVID-19. Mr. Colley must choose: attend the meeting and increase his risk during the pandemic or abstain from the meeting and receive a disciplinary citation and punishment.

## II.   Mr. Colley has presented extraordinary and compelling justification for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A).

The Government alleges that "no extraordinary and compelling reason supports Mr. Colley's release." (Doc. 215 at 1). This argument ignores extensive medical and scientific evidence regarding the vulnerability people with obesity

---

[3]     *Compare* (Doc. 210 at 21-22), *with COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/ (last visited Sept. 6, 2020).

[4]     *See* Exhibit 1, NRDAP Notice.

face during the current pandemic—and disregards the unjust disproportionality of Mr. Colley's current sentence.

The Government also attempts to minimize the gravity of Mr. Colley's situation by trying to separate the circumstances. This effort to divide and conquer is unpersuasive. Mr. Colley's health is not a factor to be considered in a vacuum, nor is the existence of the coronavirus pandemic, nor is the unnecessary and unjust length of Mr. Colley's sentence. These factors—along with Mr. Colley's record of rehabilitation—must be considered collectively. *United States v. Kimbrough*, 1:93-cr-00014-RWS, Doc. 111 at 16 (N.D. Ga. Aug. 3, 2020) (considering the defendant's medical conditions during the pandemic, his record of rehabilitation, and the "significantly lower mandatory term of imprisonment" he would be subject to under the modern § 924(c) and concluding that the defendant had established extraordinary and compelling justification for a sentence reduction).

**A. Scientific evidence definitively shows that people with obesity, at the level of Mr. Colley's obesity, are at heightened risk to severe effects of COVID-19.**

The Government argues that Mr. Colley's medical condition of obesity does not constitute an extraordinary and compelling reason. The Government presents no scientific support for its position and only very little—and distinguishable—legal support. The Government's objection to Mr. Colley's argument that his

heightened risk during the pandemic is extraordinary and compelling appears inconsistent with internal guidance from the Department of Justice (DOJ). According to filings around the country, in May 2020, DOJ issued internal guidance for federal prosecutors to concede that defendants who suffer from a medical condition identified by the Centers for Disease Control "as putting them at higher risk for severe illness from COVID-19 and who are not expected to recover from that condition, present an 'extraordinary and compelling reason' to be considered for compassionate release." *United States v. Wise*, 1:18-cr-00072-ELH, Doc. 185 (D. Md. May 18, 2020).[5]

In this district, the Government has made concessions consistent with DOJ's guidance. *United States v. Bang*, 1:18-cr-00433-SCJ-CMS, Doc. 38 (N.D. Ga. Jul. 9, 2020) (stating that the Government does not oppose the defendant's motion for compassionate release—which was based on his heart and immune system conditions); *United States v. Sams*, 4:02-cr-00061-ELR-WEJ, Doc. 124 at 6 (N.D. Ga. Jun. 24, 2020) (conceding that the defendant's COPD, asthma, and age are "extraordinary and compelling reasons for the Court to consider compassionate

---

[5]     *See also United States v. Firebaugh*, 1:16-cr-20341-UU, Doc. 43 (S.D. FL. Jun. 1, 2020) (conceding, in accordance with DOJ's internal guidance, that in this pandemic, the defendant's medical condition is an extraordinary and compelling reason); *United States v. Wright,* 8:17-cr-00388-TDC, ECF 50 (D. Md. May 19, 2020) (conceding, based on DOJ's internal guidance, that the defendant's medical condition is an extraordinary and compelling circumstance in the pandemic).

release because he faces a heightened risk from the COVID-19 pandemic," but opposing the motion on other grounds).

In the instant case, Mr. Colley has presented evidence that, according to the CDC, his obesity renders him vulnerable during the pandemic. "People of any age with certain underlying medical conditions," including obesity (having a BMI (body mass index over 30), "are at increased risk for severe illness from COVID-19."[6] While obesity is a widely misunderstood condition, it is a disease. And it is a disease that has complex effects on the human body. People who are obese are at increased risk of all causes of death as well as hypertension, heart disease, stroke, type 2 diabetes, sleep apnea, many types of cancer, and mood disorders.[7]

Researchers believe that inflammation helps explain why COVID-19 affects people with obesity so profoundly. People with obesity have a certain baseline amount of background inflammation that people with normal BMIs do not have.[8] When a person is obese, "[i]t's as if your body is [] battling itself continuously—a

---

[6]     *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/corona virus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html? CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#obesity (last visited Sept. 7, 2020).

[7]     *The Health Effects of Overweight and Obesity*, CDC, https://www.cdc.gov/ healthyweight/effects/index.html (last visited Sept. 7, 2020).

[8]     *Obesity a Major Risk Factor for COVID-19 Hospitalization*, JHU Hub, https://hub.jhu.edu/2020/06/01/david-kass-obesity-covid-19/    (last    visited Sept. 7, 2020).

little war caused by signals released from fat cells which the immune system responds to, producing a low level of background inflammation."[9] This inflammation leads to other health issues, such as insulin resistance, type 2 diabetes, hypertension, and cardiovascular disease. When a person with obesity must "battle with a novel virus that the immune system has not seen before, [the immune system] becomes hyper-activated."[10]

Obesity is also linked to impaired organ function, and it affects the same organs—the lungs, heart, and diaphragm—that are greatly affected by COVID-19. "[P]eople with obesity are more likely to have higher resistance in their airways, lower lung volumes, and weaker respiratory muscles, which are critical in the defense against COVID-19. These factors make an individual more likely to develop pneumonia, and they place additional stress on the heart."[11] "Obesity can restrict ventilation by impeding diaphragm excursion."[12] In non-scientific parlance, this means that obese people carry "a lot of excess weight mostly in their

---

[9]     *Id.*

[10]    *Risk of COVID-19 for Patients with Obesity*, OBESITY REVIEWS 21:6, https://onlinelibrary.wiley.com/doi/10.1111/obr.13034 (last visited Sept. 7, 2020).

[11]    *Latest Evidence on Obesity and COVID-19*, MEDICAL NEWS TODAY, https://www.medicalnewstoday.com/articles/latest-evidence-on-obesity-and-covid-19#Why-is-obesity-a-risk-factor (last visited Sept. 7, 2020).

[12]    *Obesity Could Shift Severe COVID-19 Disease to Younger Ages*, THE LANCET, https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)31024-2/fulltext#%20 (last visited Sept. 7, 2020).

abdomen, below the diaphragm," which "makes breathing harder."[13] Further, when a person becomes ill with COVID-19, "the membranes separating the lung airway sacs and blood vessels surrounding them become leaky, allowing fluid to enter the airways. This makes it hard to get oxygen from the air to the blood, so the diaphragm has to work even more—and obesity restricts this."[14]

Further, adipose (fat) tissue acts as a reservoir for infections. Fat cells express ACE2 at high levels, and research from past respiratory viruses has revealed that they "can attack fat, last in fat, and shed more slowly from fat. This could make an obese individual more infectious even as their symptoms get better."[15] Obesity is linked to a **42 percent** longer period of virus shedding.[16]

Finally, obesity is linked to higher rates of other illnesses and complications that result in death from COVID-19. Thrombosis,[17] for instance, is an aggravating

---

[13]   *Obesity a Major Risk Factor for COVID-19 Hospitalization*, JHU Hub, https://hub.jhu.edu/2020/06/01/david-kass-obesity-covid-19/ (last visited Sept. 7, 2020).

[14]   *Id.*

[15]   *Obesity a Major Risk Factor for COVID-19 Hospitalization*, JHU Hub, https://hub.jhu.edu/2020/06/01/david-kass-obesity-covid-19/ (last visited Sept. 7, 2020).

[16]   *Risk of COVID-19 for Patients with Obesity*, OBESITY REVIEWS 21:6, https://onlinelibrary.wiley.com/doi/10.1111/obr.13034 (last visited Sept. 7, 2020); *see also The Perfect Storm: Coronavirus (Covid-19) Pandemic Meets Overfat Pandemic*, FRONTIERS IN PUBLIC HEALTH, https://www.frontiersin.org/articles/10.3389/fpubh.2020.00135/full (last visited Sept. 7, 2020).

[17]   Thrombosis is the formation of a blood clot within a blood vessel and prevents blood from circulating properly through the circulatory system.

cause of death in COVID-19 patients.[18] "Thromboembolic risk is known to be higher in patients with obesity than in the general population."[19] *Id.* And people with obesity "are more likely to develop pneumonia" from COVID-19.[20]

The Government mischaracterizes Mr. Colley as "slightly obese." (Doc. 215 at 9). But "slight obesity" is not a class of obesity. Mr. Colley's BMI places him squarely in the middle of Class I obesity, which includes people with BMIs between thirty and thirty-five.[21] Mr. Colley's BMI is 33.2. (Doc. 210-1 at 11).

> Adults *with any degree of obesity* are more than twice as likely to experience respiratory failure and four times as likely to experience ICU admission when diagnosed with COVID-19 compared with similar adults without excess weight. . . . Compared with hospitalized adults with a BMI of less than 30 kg/m², researchers found that a BMI between 30 kg/m² and 34.9 kg/m² increased the risks for respiratory failure . . ., admission to the ICU . . . and death . . . .[22]

---

[18]    *Clinical Characteristics and Outcomes of 112 Cardiovascular Disease Patients Infected by 2019-nCoV*, https://pubmed.ncbi.nlm.nih.gov/32120458/ (last visited Sept. 7, 2020).

[19]    *Risk of COVID-19 for Patients with Obesity*, OBESITY REVIEWS 21:6, https://onlinelibrary.wiley.com/doi/10.1111/obr.13034 (last visited Sept. 7, 2020); *see also Obesity is Strongly and Independently Associated with a Higher Prevalence of Pulmonary Embolism*, RESPIRATORY INVESTIGATION, https://pubmed.ncbi.nlm.nih.gov/30770232/ (last visited Sept. 7, 2020).

[20]    *Latest Evidence on Obesity and COVID-19*, MEDICAL NEWS TODAY, https://www.medicalnewstoday.com/articles/latest-evidence-on-obesity-and-covid-19#Why-is-obesity-a-risk-factor (last visited Sept. 7, 2020).

[21]    *Defining Adult Obesity and Overweight*, CDC, https://www.cdc.gov/obesity/adult/defining.html (last visited Sept. 5, 2020).

[22]    *Mild Obesity Doubles Risk for Respiratory Failure in COVID-19* (emphasis added), ENDOCRINE TODAY, https://www.healio.com/news/endocrinology/20200716/mild-obesity-doubles-risk-for-respiratory-failure-in-covid19 (last visited Sept. 5, 2020).

Researchers from the University of North Carolina recently examined immunological and biomedical data and published studies that looked at COVID-19 patients. These researchers reached a clear conclusion: "[T]hose with obesity (BMI over 30) were at a greatly increased risk for hospitalization (113%), more likely to be admitted to the intensive care unit (74%), and had a higher risk of death (48%) from the virus."[23]

In addition to failing to present any scientific or medical evidence to support its argument that Mr. Colley's obesity is insignificant, the Government has not presented persuasive legal authority that Mr. Colley has not established an extraordinary and compelling reason to justify compassionate release. The Government cites multiple cases where defendants sought compassionate release during the pandemic based on obesity alone or in combination with hypertension or similar conditions. (Doc. 215 at 8-9). These cases are easily distinguishable, however, as the request for compassionate release was limited to the defendants' medical conditions. Here, Mr. Colley's request is based on his medical conditions during the pandemic, his unjustly long sentence in light of the modern § 924(c), *and* his record of rehabilitation. (Doc. 210 at 33-34).

---

[23]    *Obesity Linked with Higher Risk for COVID-19 Complications*, THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, https://www.unc.edu/ Posts/2020/08/26/obesity-linked-with-higher-risk-for-covid-19-complications/ (last visited Sept. 5, 2020).

Moreover, in the majority of cases cited by the Government that address a defendant's obesity, the courts denied compassionate release, in part, on the grounds that the defendant failed to allege his health was impacted by conditions within BOP or that he was unable to receive adequate treatment for his medical conditions while incarcerated. (Doc. 215 at 8-9 (citing *United States v. Votaw*, No. 2:11-CR-00514-TLN, 2020 WL 3868468, at *2 (E.D. Cal. July 9, 2020); *United States v. Wilfred*, No. CR 07-351, 2020 WL 4365531, at *4 (E.D. La. July 30, 2020); *United States v. Manny*, No. 1:17-CR-274, 2020 WL 4589038, at *3 (D.N.D. Aug. 10, 2020)).

Mr. Colley has presented evidence that he cannot manage his hypertension or his obesity while in BOP during the pandemic. (Doc. 210 at 14-16). During the pandemic, under the restrictions mentioned by the Government (Doc. 215 at 4-5), Mr. Colley does not have adequate opportunities to exercise. He does not have access to fitness machines and is without the medically required ankle brace he needs. As a result, he has gained weight, and his high blood pressure has worsened. (Doc. 210 at 14-16; 214-2 at 3).[24]

Mr. Colley has not received his tri-monthly bilateral intraocular eye pressure treatment during the pandemic. Without this treatment, he has experienced increased pressure in his eyes, resulting in severe eye pain and

---

[24]    Mr. Colley cannot exercise outside due to side effects from Lisinopril, the medication he needs for hypertension. (Doc. 214-2).

bulging of his eyes. (Doc. 214-2). Since July 2020, Mr. Colley has not had his blood pressure checked. He has also not received an annual optometry examination. Such an examination is critical for someone, like Mr. Colley, who has glaucoma and steadily deteriorating vision. (Doc. 214-2 at 2, 4).

The protective measures BOP has taken, including the restricted movements of inmates, are likely to continue throughout the pandemic. This means that, throughout the duration of the pandemic, Mr. Colley's health will continue to worsen. Even if he can avoid contracting COVID-19, he can expect to struggle to control his weight and blood pressure—measures that have been critical for his prevention of diabetes.

In the event the Court is hesitant to conclude that the heightened risk Mr. Colley faces due to his obesity, hypertension, and prediabetes alone creates an extraordinary and compelling reason for compassionate release, the Court must nevertheless conclude that this heightened risk *contributes* to justification for compassionate release. "[C]onsidered in combination with Mr. [Colley]'s rehabilitative efforts and the changes in sentencing law" discussed below, the Court should find that Mr. Colley's "potential for heightened risk weighs in favor of compassionate release." *United States v. Jones*, No. 94-CR-20079-EJD-1, 2020 WL 5035833, at *10 (N.D. Cal. Aug. 25, 2020).

**B.  Mr. Colley's sentence is unnecessarily and unjustly long.**

The Government states that a sentence reduction in light of the amendments to § 924(c) would "contravene and language and the spirit of the First Step Act" in that the First Step Act did not make the amendments to § 924(c) retroactive. (Doc. 215 at 11, n.2). To the contrary, the spirit of the § 924(c) amendments was to clarify the prior version of the statute that had resulted in unintended and harsh stacking of 20-year and 25-year penalties. Furthermore, the language that made the amendments non-retroactive is not language that Congress intended to preclude *every* defendant with a final conviction from benefitting from its clarification of § 924(c). (Doc. 210 at 30-33).

> That Section 403's amendment is not to be retroactively applied to all sentences, does not preclude consideration here. . . . [I]t was never the intent of Congress for stacking to occur for multiple § 924(c) convictions absent an intervening conviction—which did not occur here.

*United States v. Kimbrough*, 1:93-cr-00014-RWS, Doc. 111 at 16 (N.D. Ga. Aug. 3, 2020).

Of course, there is another portion of the First Step Act relevant to whether the § 924(c) amendments can be applied retroactively to Mr. Colley: the portion of the First Step Act that expanded opportunities for defendants to seek compassionate release. "After all, the very purpose of § 3582(c)(1) is to permit sentence reductions in situations where no specific statute affords a defendant

relief but 'extraordinary and compelling reasons' nevertheless call for such a reduction." *United States v. Jones*, No. 94-CR-20079-EJD-1, 2020 WL 5035833, at *8 (N.D. Cal. Aug. 25, 2020) (finding that the disparity between the defendant's sentence and the sentence he would have received under the modern § 924(c) justifies a sentence reduction under § 3582).

The Government alleges, "Mr. Colley ignores the fact that Congress expressly declines to make the particular sentencing change retroactively applicable to cases like Mr. Colley's." (Doc. 215 at 11). This is wholly inaccurate. Mr. Colley explicitly and thoroughly addressed the retroactivity of the modern § 924(c):

> Though the § 924(c) amendments are not retroactive, this does not constrain the Court. Congress "conclude[d] that not all defendants convicted under § 924(c) should receive new sentences," while also "expanding the power of the courts to relieve some defendants of those sentences on a case-by-case basis." "[T]his simply establishes that a defendant sentenced before the [First Step Act] is not *automatically* entitled to resentencing; it does not mean that the court may not or should not consider the effect of a radically changed sentence for purposes of applying § 3582(c)(1)(A)." Thus, the Court can still consider the § 924(c) amendment in deciding whether to reduce Mr. Colley's sentence.

(Doc. 210 at 34-35 (citing Pub. L. 115-391, 132 Stat. 5194, at § 403(b)) (quoting *Willingham v. United States*, 805 Fed. Appx. 815, 817 (11th Cir. 2020); *United States v. Maumau*, 08-00758-TC-11, 2020 WL 806121, at *7 (D. Utah Feb. 18, 2020); *United States v. O'Bryan*, 96-10076-03-JTM, 2020 WL 869475, at *1 (D. Kan. Feb. 21, 2020)

(emphasis added); *United States v. Decator*, CR CCB-95-0202, 2020 WL 1676219, at *4 (D. Md. Apr. 6, 2020))).

According to the Government, even if retroactivity is available, Mr. Colley should not be one of the defendants to receive the benefit of § 924(c). The Government contends that, after Mr. Colley was sentenced, "numerous other jurisdictions dismissed charges against him or imposed concurrent sentences in reliance on the fact that Mr. Colley had already received a 60-year sentence in this case." (Doc. 215 at 12). It would be improper for the Court to deny Mr. Colley the benefit of the modern § 924(c) on the basis of dismissed charges, charges of which Mr. Colley was never convicted. And Mr. Colley's concurrent sentences were not the result of only his sentence in this case; surely those sentencing courts considered a concurrent sentence appropriate under the totality of circumstances including, for example, that the offenses occurred within a short time-frame, involved a co-defendant, and were directly related to Mr. Colley's substance dependency, and that, at twenty-four years of age, Mr. Colley was young at the time of the offenses. (PSR ¶ at 78-82, 93; Identifying Data).

The Government also suggests Mr. Colley's sentence should not be reduced because he was originally sentenced "to 12 months above the low end of his Guideline range." (Doc. 215 at 12). A sentence above the low end of the guideline range or a sentence above a mandatory minimum does not make a defendant

ineligible for compassionate release. The only requirements for a sentence reduction under § 3582 are the existence of an extraordinary and compelling reason and the appropriateness under § 3553(a) factors. *See* 18 U.S.C. § 3852(c)(1)(A).

### III.   Mr. Colley does not present a danger to the community.

The Government contends, "Mr. Colley poses a danger to the community if released." (Doc. 215 at 1). This contention appears to be based solely on Mr. Colley's conduct prior to his arrest. (Doc. 215 at 12). Mr. Colley agrees his criminal history is serious. He takes responsibility for his prior actions, but they are only part of the picture. His criminal history reflects only his past behavior; it does not reflect who he is today and his rehabilitation. The accurate picture of who Mr. Colley is and whether he poses a danger to the community must include a consideration of his conduct and behavior during the past twenty-five years.[25]

---

[25]    The Government also makes this statement: "In spite of his relatively good behavior while incarcerated, Mr. Colley . . . has been assessed as a high risk of recidivism." (Doc. 215 at 13). The Government provides no source or citation for this assessment. Without offering a basis for it, Mr. Colley is hindered in responding. Mr. Colley is unaware of any such assessment.

In fact, since the filing of his amended motion in July 2020, Mr. Colley has been told by staff at USP Florence that he is being processed for transfer to a lower level institution and that such a transfer is related to a reduction in his PATTERN score (his risk of recidivism score). Until such a transfer is executed, however, Mr. Colley will not be informed as to which facility or what security level facility he is designated.

Since his sentencing in 1995, Mr. Colley has completed over twenty courses, earned his GED, obtained substance abuse treatment, and trained in three occupations—as a barber, pest control worker, and forklift operator. (Doc. 210-2 at 6-7). He has focused his programming on obtaining skills, training, and education that will specifically help him transition back into society and allow him to be a productive, contributing member of society. (Doc. 210 at 9-11).

While serving his federal sentence, Mr. Colley has received only four disciplinary citations. (Ex. 210-2 at 4-5). None of these citations involved violence, created a security threat, or jeopardized the safety of security of the institution, any staff, or any inmates. These infractions are also remote in time, with the last occurring in 2015. For the past sixty-five months, Mr. Colley has maintained impeccable conduct. *Id.*

In August 2020, C. Goodwin, Case Manager, detailed Mr. Colley's institutional adjustment:

> This memorandum is to serve the purpose of summarizing Mr. Colley's institutional adjustment during his current term of incarceration.
>
> Mr. Colley has been incarcerated since 1995. During this time, he has completed 674-hours of programming, is participating in the Non-Residential Drug Education program, has maintained consistent work assignments, has completed his GED, participates actively in religious programming, and has only received two Greatest Level incident reports in the 25-years he has been incarcerated. He also maintains excellent rapport with staff and inmates, and is a very respectful inmate.
>
> As Colley's Case Manager, it is my opinion he has been very successful during his incarceration. He has used his time wisely in a way to best prepare for his reintegration back to society.

(Doc. 214-1 at 1).

The Government has offered no argument beyond the fact of Mr. Colley's criminal history to argue that he poses a danger if released—and for good reason. All of the evidence since Mr. Colley entered federal custody uniformly shows that he has "used his time wisely," has engaged in extensive rehabilitation efforts, and can safely reenter society.

## IV.   Mr. Colley's current sentence is substantially longer than necessary in violation of § 3553.

According to the Government, "the § 3553(a) factors do not support reducing Mr. Colley's sentence, much less to time served." (Doc. 215 at 1). This contention is disingenuous, given the Government's support of commuting Mr. Colley's sentence to thirty-six years. (Doc. 215 at 12, n.3). While the Government may object to a reduction to time served, it cannot credibly argue that *any* sentence reduction is contrary to the § 3553(a) factors.

The First Step Act's amendments to § 924(c) unambiguously demonstrate that the seriousness of § 924(c) offenses can be adequately reflected through sentences much shorter than Mr. Colley's current sentence. *United States v. Adeyemi*, 06-124, Doc. 198, 2020 WL 3642478, at *28 (E.D. Pa. Jul. 6, 2020); *United States v. Brown*, No. 4:05-CR-00227-1, 2020 WL 2091802, at *10 (S.D. Iowa Apr. 29, 2020). Continuing to incarcerate Mr. Colley—after Congress and the Government

have stated that such a lengthy sentence is not necessary—would be disproportionate and unjust.

The United States District Court for the Southern District of Iowa granted compassionate release to a defendant who had been sentenced under the former § 924(c). *United States v. Brown*, 2020 WL 2091802, at *11 (S.D. Iowa Apr. 29, 2020). Had that defendant been sentenced under the modern § 924(c), he would have had four years remaining on his sentence. Nevertheless, the court reduced his sentence to time served under § 3582(c)(1)(A).

> This case indeed is about making up for past mistakes. Defendant has made up for his. Now the Court must make up for its own. Congress passed the First Step Act as a down payment in unwinding decades of mass incarceration. That law's text was explicit that it sought to increase the use of compassionate release. The Court intends to follow that directive. Defendant's motion for compassionate release is granted. . . . Defendant's term of imprisonment is reduced to time served.

*Id.* at 11. This Court can similarly reduce Mr. Colley's sentence to time served, even if he would still have time remaining on a sentence imposed under the modern § 924(c), as a time served sentence would account for his heightened vulnerability during the current pandemic and his record of rehabilitation.

Contrary to the Government's claim, Mr. Colley does not ask this Court to "substitute its judgment for the sentencing judge's decision." (Doc. 215 at 14). Mr. Colley asks the Court to consider him as he stands before the Court today—having completed over 600 hours of programming and training in three occupations,

having behaved commendably over the past five years, receiving only four disciplinary infractions in total and being medically vulnerable during this pandemic. Mr. Colley has maintained strong family relationships and has sufficiently prepared for reentry.[26] This evidence "provides the most up-to-date picture of [Mr. Colley's] 'history and characteristics'" and is "highly relevant" to the Court's § 3553(a) assessment. *Pepper v. United States*, 562 U.S. 476, 491-92 (2011).

The totality of evidence before the Court shows there are extraordinary and compelling reasons to grant compassionate release, the § 3553(a) factors warrant a sentence reduction, and the parsimony mandate of § 3553(a) requires the Court act promptly. A sentence of time served is appropriate given the current state of Mr. Colley's health and vulnerability during the current pandemic as well as his excellent prison behavior and rehabilitation; a sentence reduction also takes into account that the First Step Act's amendments to § 924(c) make clear Mr. Colley's current sentence is unnecessarily and disproportionately long.

Continuing to imprison Mr. Colley until 2051 is not a just punishment; a sentence of time served is. Mr. Colley respectfully asks the Court to grant him compassionate release.

---

[26]    *See* Exhibit 2, Evidence of Family Support, which includes messages from Mr. Colley's sister and his cousin; Exhibit 3, Certificate of Completion of Health Care Coverage Tutorial.

Dated:  This 8th day of September, 2020.

/s/ *Kimberly Sharkey*
Kimberly Sharkey
Georgia Bar No. 121472
Attorney for Terry Jerome Colley

Federal Defender Program, Inc.
Centennial Tower, Suite 1500
101 Marietta Street, N.W.
Atlanta, Georgia 30303
(404) 688-7530; Fax: (404) 688-0768
Kimberly_Sharkey@fd.org

## CERTIFICATE OF COMPLIANCE AND SERVICE

I hereby certify that the foregoing pleading was produced using Book Antigua 13-point font in accordance with Local Rule 5.1C and that, on September 8, 2020, I electronically filed this pleading with the Clerk of Court using the CM/ECF system, which will simultaneously deliver a digital copy to opposing counsel: Bret R. Hobson, Assistant United States Attorney, 6th Floor, United States Courthouse, Richard B. Russell Building, 75 Ted Turner Drive, SW, Atlanta, Georgia, 30303.

/s/ *Kimberly Sharkey*
Kimberly Sharkey
Federal Defender Program, Inc.